**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

ROBINHOOD DERIVATIVES, LLC,

Plaintiff,

v.

CATHERINE L. HANAWAY, in her official capacity as Attorney General of Missouri; MICHAEL A. LEARA, in his official capacity as Executive Director of the Missouri Gaming Commission; JAN M. ZIMMERMAN, in her official capacity as Chairman of the Missouri Gaming Commission; KEVIN M. SPAULDING, KEVIN CANTWELL, SAM GLADNEY, and ROGER STOTTLEMYRE, each in his official capacity as Commissioner of the Missouri Gaming Commission,

Defendants.

Civil Action No. 4:26-cv-01932

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Robinhood Derivatives, LLC ("Robinhood"), by and through its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

**NATURE OF THE ACTION**

1. Robinhood seeks declaratory and injunctive relief to restrain the Attorney General of Missouri and the senior officials of the Missouri Gaming Commission (the "Commission") from improperly and under color of Missouri state law assuming jurisdiction over, regulating and prohibiting Robinhood's offering and facilitation of lawful event contracts traded on federally regulated derivatives markets.

2. Robinhood is a financial-services company that offers its approved customers the opportunity to trade, among other things, event contracts through the Robinhood platform. Event contracts, including sports-, election- and entertainment-related event contracts, trade on Commodity Futures Trading Commission ("CFTC")-designated contract markets, known as "DCMs." Robinhood is registered with the CFTC as a futures commission merchant ("FCM"). As an FCM, Robinhood facilitates the placement and liquidation of event contracts for its customers, though the contracts themselves trade on registered DCMs.

3. Robinhood offers event contracts, including event contracts relating to sports, politics, entertainment, weather and other events, via several DCMs—KalshiEx, LLC ("Kalshi"); ForecastEx LLC ("ForecastEx"); Rothera Exchange and Clearing LLC ("Rothera"); and Nadex North American Derivatives Exchange, Inc. ("Nadex"). Robinhood has, since last year, offered event contracts via Kalshi, including event contracts relating to sports, politics, entertainment, weather, and other events. Robinhood also offers event contracts via ForecastEx. Beginning in 2025, for a limited period of time, Robinhood offered sports-related event contracts via ForecastEx. Robinhood does not currently offer sports-related event contracts via ForecastEx. Since June 2026, Robinhood has also offered event contracts via Rothera, which is a joint venture between Robinhood Markets, Inc. ("Robinhood Markets"), the parent company of Robinhood, and another entity. And since September 2026, Robinhood has also offered certain sports-related event contracts via Nadex, which is owned by the same parent company as the Crypto.com and OG.com platforms.

4. On September 16, 2026, Attorney General Catherine L. Hanaway sent Robinhood a cease-and-desist letter, signed by Solicitor General Louis J. Capozzi III, demanding that Robinhood "cease and desist" from offering sports wagering in Missouri or obtain a Missouri

Gaming Commission license, pay associated taxes and fees, and stop offering sports wagering to persons under 21. The letter threatened that "the State of Missouri will pursue available enforcement actions" and that Missouri would "take legal action" if Robinhood did not comply. *Ex.* A.

5. Robinhood responded by letter dated October 16, 2026, explaining that the Commodity Exchange Act ("CEA") preempts Missouri's attempt to regulate federally regulated event contracts and offering to discuss the issues before either side attempted to alter the status quo. *Ex.* B. Robinhood thereafter reached out for a follow-up discussion. On November 6, 2026, the Solicitor General informed Robinhood that "the Attorney General of Missouri now intends to seek a judicial order compelling compliance with state law in at least three days."

6. However, as applied to event contracts on DCMs, Missouri law is preempted by the CEA's comprehensive federal framework for regulating commodity futures and swaps trading. The Third Circuit recently held that "it was reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts New Jersey law from reaching into Kalshi's CFTC-licensed DCM to ban sports-related event contracts." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026); *see also United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026); *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *6-7, *14-15, *18 (N.D. Ill. Oct. 2, 2026).

7. Missouri's position rests on the premise that, despite express federal preemption and the CFTC's comprehensive regulation of derivatives trading, event contracts listed on CFTC-regulated DCMs and facilitated by CFTC-registered FCMs constitute "wagering" subject to Missouri gaming laws. That premise cannot be reconciled with the CEA. Congress vested the CFTC with "exclusive jurisdiction" over DCMs and the products traded on them precisely to

establish a single, uniform national derivatives market. *See* 7 U.S.C. § 2(a)(1)(A). Federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992).

8. The CFTC has filed actions in a number of other states, including Arizona, Connecticut, Illinois, New York, Wisconsin, Minnesota, New Mexico, Rhode Island, Kentucky and Utah, thus confirming its view that event contracts, including those related to sports, are "swaps" under the CEA and that application of state law to the offering of event contracts by CFTC-regulated DCMs and FCMs violates the Supremacy Clause.

9. The CFTC is also actively exercising its regulatory authority over event contracts through rulemaking, including a proposed rule that further defines the term "swap" to explicitly include event contracts, including those based on sports-, politics-, cultural-, and weather-related events. *See infra* ¶¶ 43-44.

10. The Attorney General's threatened enforcement action poses a direct threat to Robinhood's business and the interests of Robinhood and its customers and disrupts the comprehensive federal framework that Congress established in the CEA. Unlawful state intrusion into the CFTC's exclusive jurisdiction over event contracts traded on DCMs would immediately disrupt Robinhood's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, harm Missouri residents, and force Robinhood to choose between exercising its federal right to operate nationwide or submitting to unlawful state coercion. Such disruption to a nationally uniform market cannot be remedied through the recovery of money damages.

11. Declaratory and injunctive relief is necessary to prevent further unlawful intrusion by Missouri officials into a market they have no legal authority to regulate and to protect Robinhood's right to offer and facilitate the trading of event contracts pursuant to federal law and regulation.

## PARTIES

12. Plaintiff Robinhood is a Delaware limited liability company with its principal place of business in Chicago, Illinois. Robinhood is one of the family of companies within the broader Robinhood organization. The Robinhood companies' mission is to democratize finance for all by removing barriers to access to financial markets. Robinhood is registered with the CFTC as an FCM.

13. Catherine L. Hanaway is the Attorney General of Missouri and is sued in her official capacity. The Attorney General is Missouri's chief legal officer and has authority under Mo. Rev. Stat. § 27.060 to institute and prosecute proceedings on behalf of the State.

14. Michael A. Leara is the Executive Director of the Missouri Gaming Commission and is sued in his official capacity. The Commission licenses and regulates gaming in Missouri under Mo. Rev. Stat. § 313.004 and Mo. Const. art. III, § 39(g).

15. Jan M. Zimmerman is the Chairman of the Missouri Gaming Commission and is sued in her official capacity.

16. Kevin M. Spaulding is a Commissioner of the Missouri Gaming Commission and is sued in his official capacity.

17. Kevin Cantwell is a Commissioner of the Missouri Gaming Commission and is sued in his official capacity.

18. Sam Gladney is a Commissioner of the Missouri Gaming Commission and is sued in his official capacity.

19. Roger Stottlemyre is a Commissioner of the Missouri Gaming Commission and is sued in his official capacity.

20. Together, Defendants would be responsible for enforcing the Attorney General's September 16, 2026 cease-and-desist letter and other demands from the State that Robinhood comply with Missouri gaming and sports-wagering laws that are preempted by federal law.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over Robinhood's claim pursuant to 28 U.S.C. § 1331. This action presents a federal question under the Supremacy Clause of the United States Constitution because it concerns whether Missouri laws are preempted by the CEA, 7 U.S.C. § 1 *et seq.*, to the extent they purport to regulate transactions traded or executed on a DCM. The Court may award declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202.

22. The Eleventh Amendment does not preclude this Court from exercising jurisdiction because, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may sue a state official acting in his or her official capacity for prospective declaratory and injunctive relief from violations of federal law. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011); *Mo. Prot. & Advoc. Servs. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007).

23. This Court has personal jurisdiction over Defendants. Defendants are Missouri officials who perform their official duties in Missouri.

24. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendants reside and perform their official duties in Missouri, and a substantial part of the events giving rise to Robinhood's claim occurred in the Eastern District of Missouri. *See infra* ¶ 55.

## RELEVANT FACTS

### A. Event Contracts

25. An event contract is a type of derivative that allows customers to trade on their predictions about the occurrence of future events. Event contracts are typically structured as binary options posing a particular yes-or-no question. A buyer takes the "yes" side and a seller takes the "no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.

26. Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur. For example, for an event contract worth $1, if the "yes" position is trading at 17 cents and the "no" position is trading at 83 cents, that implies that the market believes there is a 17% chance the event will occur. If new information becomes available that indicates that the event is more likely to occur, market participants' trading will change in ways that reflect that new information (for example, more market participants might purchase the "yes" position), which will cause the price of the "yes" position to go up. Thus, the price of an event contract can reveal valuable information about market sentiment concerning the underlying event and can therefore be an important information-gathering tool.

27. Traders may use event contracts to mitigate risk (*e.g.*, an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage) or simply to seek a financial return.

28. Sports-related event contracts can also serve a hedging and information-gathering function. Sports outcomes can have significant economic consequences for teams, owners, leagues, broadcasters, sponsors, ticket sellers, and host cities and regions. Market prices can therefore aggregate information about those consequences and permit participants with related

economic exposure to manage risk. *See* Rebecca Tauber, *Why sports bar owners are hedging against the teams they love*, N.Y. Times (Oct. 30, 2026) (describing how businesses use sports-related event contracts to hedge); Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026) (describing Game Point Capital, a sports-focused insurer, using event contracts to hedge); CFTC, Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,869-70 (June 12, 2026).

**B. Robinhood Makes Available Certain Event Contracts**

29. Companies within the Robinhood organization are financial-services companies that are democratizing finance by removing barriers to access to financial markets, including by offering zero-commission stock trading and easy-to-use mobile and web applications. With their commitment to offering low fees, an intuitive mobile experience, and powerful tools, the Robinhood companies empower everyday investors to navigate financial markets safely and efficiently. Robinhood is registered with the CFTC as an FCM, which is an entity that solicits or accepts orders to buy or sell futures and swaps and accepts payment from customers to support such orders. *See* 7 U.S.C. § 1a(28).

30. Robinhood has routed event contracts through Kalshi since 2025. Kalshi is a CFTC-regulated DCM. Kalshi offers many types of event contracts relating to a variety of areas, including climate, technology, health, cryptocurrencies, popular culture, economics and sports. Kalshi self-certified that its event contracts comply with the CEA's requirements and began listing them on January 24, 2025. Because the CFTC declined to review or prohibit Kalshi's event contracts, they were deemed approved by the CFTC, became effective and are legal under federal law. *See infra* ¶¶ 40-42.

31. Robinhood also offers event contracts via ForecastEx, another DCM. Beginning in 2025, for a limited period of time, Robinhood offered sports-related event contracts via

ForecastEx. ForecastEx self-certified that its sports-related event contracts comply with the CEA's requirements and began listing them shortly thereafter. Robinhood does not currently offer any sports-related event contracts via ForecastEx.

32. Rothera is a CFTC-regulated DCM, which currently offers event contracts related to economic indicators, sports, elections and politics. Robinhood Markets formed a joint venture that owns 90% of the equity in Rothera, and Robinhood began offering event contracts through Rothera in June 2026. Because the CFTC declined to review or prohibit Rothera's event contracts, they were deemed approved by the CFTC, became effective and are legal under federal law. *See infra* ¶¶ 40-42.

33. Nadex is a CFTC-regulated DCM, which currently offers event contracts relating to sports, climate, economics, politics, and culture, including through the Crypto.com and OG.com platforms. On September 8, 2026, Robinhood began routing a selection of sports-related event contracts for execution on Nadex's DCM. Like the other DCMs, Nadex self-certified its sports-related event contracts, and because the CFTC declined to review or prohibit them, they were deemed approved by the CFTC, became effective and are legal under federal law. *See infra* ¶¶ 40-42.

34. On March 17, 2025, Robinhood launched its Prediction Markets Hub, through which its customers can place event contract trade orders. Robinhood currently intermediates its customers' sports-related event contract trades on the exchanges of several DCMs, including Kalshi, Rothera, and Nadex. Robinhood has entered into agreements with these DCMs that allow Robinhood to access their contract market facilities for this purpose. Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with the exchanges' rules.

35. This means that while Robinhood customers place orders for event contract trades in their Robinhood accounts, the *trades* themselves take place on CFTC-designated exchanges such as those of Kalshi, Rothera, and Nadex. The user interface is Robinhood's, which is convenient for Robinhood customers but does not affect how the trades are executed on the exchanges or regulated by the CFTC; it merely adds additional CFTC regulation of Robinhood's activities as an FCM.

### C. The Commodity Exchange Act and the Commodity Futures Trading Commission

36. Since the 1930s, futures contracts have been regulated by the federal government. In 1936, Congress passed the CEA, which provided for federal regulation of all commodity futures trading activities and required that all futures and commodity options be traded on organized, regulated exchanges.

37. In 1974, Congress passed a series of amendments to update the CEA's regulatory framework and established the CFTC, which is empowered to oversee and regulate commodity futures and (since 2010) swaps trading under the CEA. Congress intended to centralize regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to regulate the futures markets, thereby subjecting exchanges to different regulations. Hearings Before the Committee on Agriculture and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995). Accordingly, Congress put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). Indeed, Congress considered adding but

ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). As described below, the CEA was further amended by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

38. The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps and contracts of sale of a commodity for future delivery—traded on registered exchanges (known as DCMs): "The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or commonly known to the trade as, an 'option' . . . ), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title* . . . ." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

39. To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price

manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51. The CFTC is authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b).

40. An exchange may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements. *Id.* § 7a-2(c)(1), (c)(4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B).

41. The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010. Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36. With respect to event contracts specifically, the CFTC may prohibit event contracts in specific categories (activity that is unlawful under federal or state law, terrorism, assassination, war, and gaming) if it determines them to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).

42. If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days of receiving notice of it. *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to select a 90-day review period for event contracts). If the CFTC does not act within that window, the new contract is deemed approved and becomes effective. *See* 7 U.S.C. § 7a-2(c)(2).

43. The CFTC actively regulates prediction markets and the event contracts that trade on them. Indeed, on June 12, 2026, the CFTC issued a Notice of Proposed Rulemaking ("NPRM"), which proposes rules that, if adopted, would "further specify the types of event contracts that may be subject to a determination that they are contrary to the public interest" under the Special Rule.

CFTC, Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,806 (June 12, 2026). The NPRM sets out several factors that will be used to assess an event contract involving activity that is unlawful under federal or state law, terrorism, assassination, war, and gaming to determine whether such an event contract is contrary to the public interest: (1) the hedging or price-basing utility of the contract; (2) the potential for market manipulation and related risks; and (3) whether the trading or clearing of the contract "would challenge the prediction market's self-regulatory tools or compliance infrastructure because of the event contracts' involvement of Enumerated Activities." *Id.* at 35,829. The NPRM states that sports-related event contracts relating to "final scores, point differentials, win-loss results, tournament advancement, individual or team statistical performance or season long performance metrics are unlikely to be contrary to the public interest," *id.* at 35,869-70, and that the CFTC will exercise its exclusive authority to prohibit certain sports-related event contracts which it finds are contrary to the public interest (likely to include contracts involving player injuries, pre-collegiate sporting events, and physical altercations, among others), *id.* at 35,870-71. On September 24, 2026, the CFTC stated that it expects its revised version of 17 C.F.R. § 40.11 to become final within two months, *see* CFTC Brief, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sept. 24, 2026), Dkt. 29.1—timing that is now imminent.

44. On October 19, 2026, the CFTC took further action concerning event contracts. It issued an Interim Final Rule excluding casino-style gambling products from the definition of "swap," 91 Fed. Reg. 65,969, 65,971, 65,979 (Oct. 19, 2026), and issued an NPRM defining "swap" to explicitly include event contracts, including sports-related event contracts, 91 Fed. Reg. 66,022, 66,031 (Oct. 19, 2026).

45. Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants. Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants. Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly. These markets may be at risk of market manipulation and other market distortions and inefficiencies. For sports bets, by comparison, casinos set a line, typically ahead of time and, once a bet is placed, the line does not change for that bet. Gamblers bet directly against the house, and once a position is entered, gamblers typically do not have the option to exit their position. Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler. Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation. The federal regulations that govern commodity futures and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

46. Robinhood is registered with the CFTC as an FCM. As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28) (cleaned up). FCMs must register with the CFTC unless they fall within certain exemptions. *Id.* § 6f; 17 C.F.R. § 3.10(c).

47. Similar to a DCM, registered FCMs such as Robinhood must comply with a host of federal requirements. FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17. FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and the CFTC's regulations set forth elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15. The CFTC requires FCMs to "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards. *Id.* § 155.3. FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest. *Id.* § 1.71. Finally, the CFTC imposes recordkeeping requirements on FCMs. *Id.* §§ 1.14, 1.18. Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant." *Id.* § 1.17(a)(4).

**D. Missouri's Sports-Wagering and Gambling Laws**

48. In November 2024, Missouri voters approved Amendment 2, authorizing a regulated sports-wagering market administered by the Commission under Mo. Const. art. III, § 39(g). Section 39(g) provides that sports wagering may be offered only by Commission licensees and imposes a 10% wagering tax on adjusted gross revenue under § 39(g)(10)(a). License applicants must pay initial and renewal fees that may be as much as $500,000 under § 39(g)(6).

49. Missouri's sports-wagering regime limits licenses to excursion gambling boats, professional sports teams, and operators acting on their behalf, subject to the categories and limits

in Mo. Const. art. III, § 39(g)(4), and requires all wagers to be initiated, made, or otherwise placed while the bettor is physically present in Missouri, with geofencing required under § 39(g)(12). The Commission licenses and regulates gaming under Mo. Rev. Stat. § 313.004 and Mo. Const. art. III, § 39(g). Robinhood cannot obtain such a sports-wagering license, because it does not operate an excursion gambling boat or a professional sports team, and also because it serves customers nationally, including in states other than Missouri.

50. Missouri separately permits the Commission to issue up to two mobile licenses directly to sports-wagering operators without an excursion gambling boat or professional sports team affiliation under Mo. Const. art. III, § 39(g)(4)(c), but those licenses have already been awarded. On August 15, 2025, the Commission selected DraftKings and Circa Sports as the two qualified applicants for the direct mobile licenses, and on April 29, 2026, it granted each of them a license. *See* Mo. Gaming Comm'n, Resolution No. 25-139, Regarding Selection of Top Two Qualified Applicants for a Direct Mobile License (Aug. 15, 2025); Mo. Gaming Comm'n, Resolution No. 26-022, Regarding Licensure of Mobile Sports Wagering Platform Circa Hospitality Group I LLC, d/b/a Circa Sports (Apr. 29, 2026); Mo. Gaming Comm'n, Resolution No. 26-023, Regarding Licensure of Mobile Sports Wagering Platform DK Crown Holdings Inc., d/b/a DraftKings (Apr. 29, 2026). Thus, Robinhood cannot obtain an independent mobile sports-wagering license either.

51. And even if Robinhood could meet the requirements for a sports-wagering license, an application does not guarantee a license, as Robinhood would still have to pass a suitability investigation under 11 C.S.R. § 45-20.060. That rule permits the Commission to deny a license based on conduct that "poses a threat to the public interests of the state of Missouri" or "poses a

threat to public health, safety, morals, good order, and general welfare of the people of the State of Missouri." *Id.* § 45-20.060(3)(E)(1)-(2).

52. Missouri criminalizes unauthorized gambling and related conduct under Mo. Rev. Stat. §§ 572.010-.070. Promoting gambling in the first degree and possession of gambling records in the first degree are Class E felonies under §§ 572.030 and 572.050; other provisions impose misdemeanor liability. Section 572.090 authorizes abatement of a public nuisance, and § 513.660 provides additional forfeiture-related authority. The Attorney General may also pursue claims under the Merchandising Practices Act, Mo. Rev. Stat. § 407.020.

53. Missouri's gambling definition excludes bona fide business transactions valid under the law of contracts, including contracts for the purchase or sale at a future date of securities or commodities. Mo. Rev. Stat. § 572.010(4). Event contracts traded on DCMs fall under federal derivatives regulation and are therefore bona fide business transactions valid under the law of contracts, while Missouri's sports-wagering rules impose a separate state-level approval regime, including 11 C.S.R. §§ 45-20.340, 45-20.350, 45-20.360 and 45-20.450.

54. Missouri authorizes administrative fines of up to $50,000 per violation, or $100,000 for violations arising from the same occurrence of events. Mo. Const. art. III, § 39(g)(4)(k); 11 C.S.R. § 45-20.150(4), (5). The Missouri regime therefore combines licensing, taxes, fees, age and geolocation restrictions, event-approval requirements, criminal sanctions, abatement, and substantial fines.

### E. Missouri's Cease-and-Desist Letter to Robinhood and Threatened Enforcement

55. On September 16, 2026, Attorney General Hanaway sent Robinhood a cease-and-desist letter captioned "Unlicensed Sport Wagering Operations in Missouri." The letter was issued from the Missouri Attorney General's Office at 815 Olive Street, St. Louis, Missouri. The letter

characterized Robinhood as "an online sports wagering platform offering sports wagering" to individuals in Missouri, asserted that Robinhood was operating without a Commission license, and demanded that Robinhood either cease and desist or obtain a license, pay all associated taxes and fees, and stop offering sports wagering to persons under 21. Ex. A at 1.

56. The letter threatened that "the State of Missouri will pursue available enforcement actions against Robinhood" and later stated that "the State of Missouri will take legal action" unless Robinhood complied. It gave Robinhood thirty days to confirm compliance or cessation. The letter also cited the 10% wagering tax, license fees of up to $500,000, the under-21 prohibition, and the affirmative duty to prevent wagers by persons under 21. Ex. A at 1-3.

57. On September 17, 2026, the Attorney General issued a press release announcing cease-and-desist letters to six DCMs or FCMs, including Robinhood. *See* Press Release, Mo. Att'y Gen., Missouri Attorney General Hanaway Orders Unlicensed Prediction Markets To Cease And Desist Unlawful Sports Wagering (Sept. 17, 2026). In a September 17, 2026 interview, the Attorney General stated that "[e]ven though [event contract] fee structure might be a little bit different, it still fits four square the definition of gambling in Missouri." Blake Schowalter, *Missouri Attorney General Sends Cease-and-Desist to Prediction Market Companies*, KFVS12 (Sept. 17, 2026).

58. Prior to the cease-and-desist letter, on April 30, 2026, Executive Director Leara submitted a comment letter, on behalf of the Commission, to the CFTC asserting that "[g]aming regulation is properly left to the states" and urging the CFTC to "properly reserve jurisdiction over sports event contracts for the states, as intended by Congress." He further asserted that sports-event contracts were not swaps or commodities under the CEA and that unlicensed sports event

contracts were unlawful in Missouri. Comment Letter from Mo. Gaming Comm'n to Commodity Futures Trading Comm'n (Apr. 30, 2026).

59. Subsequent to the cease-and-desist letter, Attorney General Hanaway also signed an amicus brief supporting a petition for a writ of certiorari in *Flaherty*, arguing that the Supreme Court should review the Third Circuit's decision holding that the CEA preempts state regulation of sports-related event contracts. Amicus Br., *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. Oct. 7, 2026). Missouri's public positions thus confirm that Defendants intend to enforce state law against Robinhood's federally authorized and regulated activities.

60. Robinhood's October 16, 2026 response to the Missouri Attorney General's Office explained that Robinhood is a CFTC-registered FCM and that its customers' event contracts trade on DCMs. Robinhood explained that DCM trading is anonymous, that Robinhood does not have visibility into the counterparties to its customers' trades, and that prices are set by the market rather than by an operator. Robinhood maintained that Missouri's licensing, tax, and age restrictions are preempted and offered to discuss the issues before either side attempted to alter the status quo. *Ex.* B.

61. Robinhood thereafter reached out to the Missouri Attorney General's Office to discuss the issues, but the parties did not reach agreement.

62. On November 6, 2026, the Solicitor General informed Robinhood that "the Attorney General of Missouri now intends to seek a judicial order compelling compliance with state law in at least three days."

63. Kalshi, Nadex and two other DCMs have filed actions in federal court in Missouri challenging the same threatened state enforcement. *See KalshiEX LLC v. Hanaway*, No. 4:26-cv-01860 (E.D. Mo. Oct. 27, 2026); *Ludlow Exchange, LLC v. Hanaway*, No. 4:26-cv-01780 (E.D.

Mo. Oct. 16, 2026); *N. Am. Derivatives Exch., Inc. v. Hanaway*, No. 4:26-cv-00969 (W.D. Mo. Oct. 16, 2026); *Underdog Exchange DCM, Inc. v. Hanaway*, No. 2:26-cv-04300 (W.D. Mo. Nov. 8, 2026).

64. The Attorney General's demand that Robinhood simply "obtain a license" is illusory for Robinhood. Robinhood is not an excursion gambling boat or professional sports team and does not operate on behalf of either. Missouri's two direct mobile sports-wagering licenses have already been awarded to DraftKings and Circa Sports. Moreover, Robinhood has customers nationwide, including in states outside Missouri. Robinhood therefore cannot obtain the license Missouri demands without abandoning its federally regulated FCM model and submitting to state requirements that conflict with the CEA's framework for federally regulated derivatives.

### F. The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.

65. Transactions involving event contracts traded on a CFTC-designated contract market are subject to the CFTC's exclusive jurisdiction, and Missouri law is preempted to the extent it purports to regulate those transactions. As the Third Circuit held in affirming a preliminary injunction against New Jersey, "it was reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts New Jersey law from reaching into Kalshi's CFTC-licensed DCM to ban sports-related event contracts." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026).

66. The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption. Field preemption exists where Congress manifests an

intent to occupy exclusively an entire field of regulation. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Conflict preemption exists where compliance with federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation omitted).

67. The statutory language of the CEA, its legislative history and the comprehensive regulatory framework it sets out demonstrate that Congress deliberately preempted state law. Whether analyzed as express or implied preemption, the scope of preemption is the field of commodity futures and swaps trading, including event contract trading, on CFTC-designated exchanges.

68. The CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over commodity futures and swaps traded on CFTC-designated exchanges. 7 U.S.C. § 2(a)(1)(A). The "plain meaning" of a grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any other body, including the States. *See Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). Indeed, express provisions of this type are regularly held to preempt state law. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).

69. This express preemption provision includes event contracts, which are transactions in both "swaps" and "contracts of sale of a commodity for future delivery," over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). The term "swap" includes "any agreement, contract, or transaction" that, among

other things, "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act. *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)), 124 Stat. 1376, 1666, 1672.

70. In the alternative, event contracts are transactions in a type of intangible commodity that the CEA calls an "excluded commodity." *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (reviewing "excluded commodities" under the CEA). An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

71. These are precisely what the event contracts traded on the DCMs with which Robinhood has partnered are. To take one example, event contracts are within these statutory definitions of swaps and transactions in excluded commodities because: (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying events they concern are associated with a potential economic consequence. *See Flaherty*, 172 F.4th at 227-28.

72. With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or schools they represent, their communities, the television networks that cover the matches, and other stakeholders. These economic consequences include, among many other things, increased revenue

from ticket sales, sponsorships and TV viewership for winning teams, and boosts in economic activity for cities where playoff games occur. Missouri's theory that sports-related event contracts are unlawful fails to explain why these sports-related event contracts, which clearly have economic consequences, do not meet the CEA's definitions of swaps or transactions in excluded commodities.

73. The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility." *Id.* § 7a-2(c)(5)(C)(i). The "special rule," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat. at 1735-36, makes clear that the CEA's grant of exclusive jurisdiction to the CFTC extends to event contracts.

74. To the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that this grant of exclusive jurisdiction was intended to preempt state law. As the Conference Committee explained:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading

> industry, the Conferees do not contemplate that there will be a need for supplementary regulation by the States.

H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978). As the D.C. Circuit has recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original). "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'" *Witzel v. Chartered Sys. Corp. of N.Y.*, 490 F. Supp. 343, 347 (D. Minn. 1980) (quoting *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979)). Likewise, the history surrounding the adoption of the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).

75. Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption. "The [CEA], first passed in 1936, regulates derivatives markets. At first, the law did not preempt state regulation in the area. But that resulted in a patchwork of state regulations, so Congress amended the Act in 1974 and created the CFTC to oversee trading on federally designated 'contract market[s].'" *Flaherty*, 172 F.4th at 226 (quoting 7 U.S.C. § 2(a)(1)(A)); *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) ("The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies."). Establishing the CFTC and

endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos."). Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974). Congressional statements concerning the event contract "special rule," including by the drafters of the Dodd-Frank Act of 2010, are consistent with these earlier statements and reveal clear Congressional intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Lincoln conveying her intent and that of Sen. Dodd).

76. As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC.

77. The CEA's comprehensive regulatory scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012). The Eighth Circuit likewise recognizes that state law is conflict-preempted when it stands as an obstacle to federal objectives. *See WinRed, Inc. v. Ellison,* 59 F.4th 934, 941 (8th Cir. 2023); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025). Any presumption against preemption is inapplicable because the CEA contains an express exclusive-

jurisdiction provision and the relevant field is derivatives trading, not gambling. The CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).

78. The Supreme Court's companion decisions in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), and *Rice v. Board of Trade*, 331 U.S. 247 (1947), confirm the significance of Congress's choice of the phrase "exclusive jurisdiction." In *Santa Fe Elevator*, the Court held that the United States Warehouse Act's grant of "exclusive" jurisdiction to the Secretary of Agriculture, among other things, preempted state law. 331 U.S. at 232-38. In *Board of Trade*, decided the same day, the Court held that the CEA did not preempt state law and, in so holding, contrasted the Warehouse Act, which used the word "exclusive," with the CEA, which at the time did not. 331 U.S. at 253. Congress later amended the CEA to give the CFTC "exclusive jurisdiction," to address precisely the gap the Court identified. *See* 7 U.S.C. § 2(a)(1)(A).

79. Accordingly, the CEA, as amended in 1974 to give the CFTC exclusive jurisdiction and in 2010 to add swaps and the special rule regarding event contracts, expressly and impliedly preempts the field of commodity futures and swaps trading, including event contracts trading, on DCMs.

80. In addition to express or implied field preemption, conflict preemption exists because Missouri's regime requires state approval of event types and wager types, while the CEA assigns those determinations to the CFTC. Missouri requires licensees to accept only wagers approved by the Commission under 11 C.S.R. § 45-20.450(1) and only on events listed in the approved-events catalog under § 45-20.340. It also permits categorical bans under § 45-20.360 and public-policy exclusions under § 45-20.350. If Missouri were allowed to make those

determinations for DCM-traded contracts, there would be a direct conflict with the CFTC's federal approval and public-interest review processes.

81. Missouri also prohibits licensees from accepting wagers from partnerships, corporations, associations, or other non-individual entities. 11 C.S.R. § 45-20.360(4). The CEA, by contrast, defines "person" to include individuals, associations, partnerships, corporations, and trusts. 7 U.S.C. § 1a(38). Applying Missouri's individual-only rule to DCM-traded contracts would exclude participants whom federal law permits to trade.

82. In an October 7, 2026 amicus brief in *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir.), the CFTC reaffirmed its view that event contracts, including sports-related event contracts, are "swaps" under the CEA and that the CEA preempts state regulation of swaps traded on DCMs. The CFTC stated: "if the Commission has 'exclusive jurisdiction . . . with respect to' a transaction, other governmental authorities—including the States—necessarily lack 'jurisdiction' to regulate that transaction." Br. for CFTC as Amicus Curiae in Support of Plaintiff-Appellant at 10, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir. Oct. 7, 2026).

83. Multiple courts have recognized that analogous state efforts to regulate event contracts traded on a DCM under state gaming statutes are preempted. In *Flaherty*, the Third Circuit held that sports-related event contracts fit within the CEA's swap definition and that state gaming law is preempted. 172 F.4th 220, 228-30 (3d Cir. 2026). In *KalshiEX LLC v. Assad*, while the Ninth Circuit erroneously held that sports-related event contracts are likely not swaps, it correctly held that Section 2(a)(1)(A) preempts state regulation of swaps traded on a DCM. 2026 WL 2543846 (9th Cir. Aug. 28, 2026).

84. A federal district court within the Eighth Circuit has reached the same conclusion as in *Flaherty*. In *United States v. Minnesota*, the CFTC itself sued to enjoin a newly enacted

Minnesota statute designed to ban prediction markets, and the court held that the CFTC was "likely to succeed on the merits of [its] express-preemption claims" as to the statute. 2026 WL 2150211, at *9 (D. Minn. July 27, 2026). The court explained that § 2(a)(1)(A)'s "exclusive jurisdiction" language "reflect[s] congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities." *Id.* at *10.[1]

85. Just last month, a federal court in the Northern District of Illinois reached the same result on conflict preemption grounds, holding that state licensing requirements and age restrictions on DCM-traded swaps "likely constitute[] impermissible control over Kalshi or the trading of swaps." *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *14-15 (N.D. Ill. Oct. 2, 2026).

86. Although other courts have reached contrary conclusions, Robinhood respectfully disagrees with those decisions, and notes that there are multiple petitions for writs of certiorari presenting these issues pending before the Supreme Court of the United States. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), *petition for cert. filed*, No. 26-299 (U.S. Sept. 2, 2026); *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831, 2026 WL 2546925 (9th Cir. Aug. 28, 2026), *petition for cert. filed*, No. 26-338 (U.S. Sept. 10, 2026); *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, 2026 WL 2546926 (9th Cir. Aug. 28, 2026), *petition for cert. filed*, No. 26-344 (U.S. Sept. 11, 2026).

---

[1] A Southern District of Iowa court reached the opposite conclusion. *See KalshiEx LLC v. Bird*, 2026 WL 2691009 (S.D. Iowa Sept. 8, 2026). That decision is now on appeal to the Eighth Circuit with Kalshi's opening brief due December 7, 2026. *See* 8th Cir. Case No. 26-2874.

### G. The CEA's Preemption of State Gaming Laws as Applied to Event Contracts Includes Those Opened and Traded Through Robinhood's Platform.

87. Robinhood facilitates transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC). Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the *entire* transaction and all participants. This includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as the DCMs that execute transactions.

88. If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading. A state cannot circumvent the exclusive jurisdiction of the CFTC by enforcing state law against an entity involved in *facilitating* a transaction when the state would be prohibited from enforcing state law against the entity involved in executing that same transaction. Indeed, as the CFTC itself explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [DCM]*." CFTC Brief, *KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, 2024 WL 4512583, at *27 (D.C. Cir. Oct. 16, 2024) (emphasis added).

89. The conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs such as Robinhood within the extensive set of federal regulatory requirements and CFTC oversight

established to manage commodity derivatives trading. The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps; indeed, this is in part what defines an FCM, 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (CC). As noted above, FCMs such as Robinhood that are registered with the CFTC must comply with a multitude of requirements, including minimum financial requirements, 17 C.F.R. §§ 1.12, 1.17, reporting requirements, *id.* §§ 1.10(b), 1.10(d), 17.00, and disclosure requirements, *id.* § 1.55. They must also establish and enforce policies relating to trading standards, risk management, and conflicts of interest. *Id.* §§ 1.15, 1.71, 155.3. State regulation of orders on an FCM (when those orders will be executed on a DCM) would conflict with federal authorization of transactions through FCMs subject to CFTC jurisdiction. *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

90. In short, the "oversight of futures commission merchants" is an "important aspect" of the CFTC's oversight responsibility for futures trading. *Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013). FCMs including Robinhood are therefore an integral part of the fabric of the CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs.

**H. Robinhood Will Suffer Irreparable Harm Without Injunctive Relief.**

91. In light of Missouri's threat to "seek a judicial order compelling compliance with state law," Robinhood faces the threat of an enforcement action and potential criminal and civil liability. Missouri law includes felony and misdemeanor penalties under Mo. Rev. Stat. §§ 572.020–.070, penalties under Mo. Rev. Stat. § 407.020, abatement under § 572.090, and

administrative fines of up to $50,000 per violation or $100,000 for violations arising from the same occurrence. Mo. Const. art. III, § 39(g)(4)(k); 11 C.S.R. § 45-20.150(4), (5). A credible threat of prosecution under a preempted state statute causes irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

92. Further, the harm to Robinhood's reputation caused by potential or actual enforcement proceedings by Missouri is irreparable because it cannot be easily or quickly repaired. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (explaining that damage to reputation is a harm that cannot be remedied by a later award of monetary damages); *see also Flaherty*, 172 F.4th at 231; *United States v. Minnesota*, 2026 WL 2150211, at *14; *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *18. Robinhood also stands to lose the goodwill of its customers, including its customers in Missouri. That goodwill, once lost, cannot easily or quickly be regained, even if Robinhood ultimately prevails. *See United Healthcare*, 316 F.3d at 741 (recognizing irreparable harm from loss of goodwill).

93. If Robinhood were to cease offering event contract trading in Missouri, it would forgo significant business and revenue. Those economic losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages against Missouri officials. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999); *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899-900 (8th Cir. 2000); *Baker Elec. Coop. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). Damages that are unrecoverable due to sovereign immunity constitute irreparable harm. *See Rogers Grp. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010); *Bank One, Utah v. Guttau*, 190 F.3d 844, 851 (8th Cir. 1999).

94. Abruptly discontinuing Missouri customers' ability to open new sports-related event contract positions would undermine customers' confidence in Robinhood and their reliance

on its financial services, causing irreparable harm. *See Flaherty*, 172 F.4th at 231; *United States v. Minnesota*, 2026 WL 2150211, at *14.

95. Inaction in the face of the Attorney General's assertion of authority to regulate the offering of event contracts by DCMs and FCMs would threaten the future of Robinhood's business in Missouri. It would leave Robinhood with uncertainty about its Missouri event-contract business and inflict the reputational harms associated with an enforcement action.

96. Given the imminent threat that Missouri will attempt to enforce preempted state law against Robinhood, Robinhood has no way to avoid irreparable harm absent injunctive relief. The balance of equities and public interest also favor preserving the status quo. *See Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Preserving the status quo is appropriate because Robinhood has offered event contracts to customers in Missouri for more than a year, and Missouri's threatened enforcement would disrupt a nationally uniform federal derivatives market.

97. There is an imminent likelihood that Defendants will violate the Supremacy Clause. Robinhood seeks declaratory and injunctive relief restraining Defendants from enforcing Missouri law to the extent it purports to regulate Robinhood's offering and facilitation of event contracts traded on a DCM.

## <u>COUNT I</u>

### (Supremacy Clause – Preemption by Commodity Exchange Act)

98. Robinhood restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

99. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme

> Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

100. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government and to the extent state law conflicts with federal law.

101. Congress preempted the regulation of commodity futures and swaps trading on CFTC-designated markets, leaving no room for parallel state regulation. Through the CEA, Congress granted the CFTC "exclusive jurisdiction" to regulate "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" "traded or executed on a contract market" designated by the CFTC. 7 U.S.C. § 2(a)(1)(A). This exclusive grant of jurisdiction includes transactions involving event contracts.

102. Because the CEA and CFTC regulations occupy the entire field of commodity futures and swaps trading on CFTC-designated markets and/or conflict with state law, Defendants' threatened enforcement of Missouri gambling and sports-wagering laws is preempted by the CEA and the CFTC's regulations pursuant to the Supremacy Clause. By threatening to enforce Mo. Const. art. III, § 39(g), including § 39(g)(1), (4), (6), (9), (10)(a), (12), and (15); Mo. Rev. Stat. §§ 313.004, 407.020, 513.660, 572.010, 572.020, 572.030, 572.040, 572.050, 572.060, 572.070, and 572.090; 11 C.S.R. §§ 45-20.010 *et seq.*, including §§ 45-20.150, 45-20.340, 45-20.350, 45-20.360, and 45-20.450; and any other Missouri law against Robinhood for offering or facilitating transactions involving event contracts via DCMs such as Kalshi, Rothera, and Nadex, Defendants are intruding on the CFTC's exclusive jurisdiction.

103. Robinhood has suffered and continues to suffer irreparable harm as a result of the Defendants' actions and has no remedy at law to address the conduct complained of herein. The

equities and public interest tilt strongly in Robinhood's favor because without relief, the harm to Robinhood will be significant, and by contrast, the State and the public would suffer little to no harm if the requested relief is granted.

104. To prevent further harm to Robinhood, the Court should enjoin Defendants from enforcing preempted Missouri law against Robinhood in contravention of the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robinhood respectfully requests that the Court enter judgment in favor of Robinhood and against Defendants:

i. Issuing a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Plaintiff and its affiliates Mo. Const. art. III, § 39(g), Mo. Rev. Stat. §§ 313.004, 407.020, 513.660, 572.010–.070, 572.090, 11 C.S.R. §§ 45-20.010 *et seq.*, or any other Missouri law that attempts effectively to regulate Plaintiff's involvement in transactions involving event contracts traded on a DCM;

ii. Awarding a declaration that the foregoing Missouri laws, and any other Missouri law, as used to regulate Plaintiff's involvement in transactions involving event contracts traded on a DCM, violate the Supremacy Clause as applied to Plaintiff and its affiliates; and

iii. Granting such other and further relief as the Court deems just and proper.

DATED: November 9, 2026

Respectfully submitted,

By: */s/ Christopher A. Smith*
Christopher A. Smith

**HUSCH BLACKWELL LLP**

Christopher A. Smith, Bar No. 53266MO
Mary K. Mullen, Bar No. 70265MO
Kasey Groneck, Bar No. 76632MO
Chris.Smith@huschblackwell.com
MaryKate.Mullen@huschblackwell.com
Kay.Groneck@huschblackwell.com

8001 Forsyth Boulevard, Suite 1500
St. Louis, Missouri 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan (*pro hac vice forthcoming*)
aryan@cravath.com
Kevin J. Orsini (*pro hac vice forthcoming*)
korsini@cravath.com
Brittany L. Sukiennik (*pro hac vice forthcoming*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Robinhood Derivatives, LLC*